IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 18, 2000

## STATE OF TENNESSEE v. NICHOLAS WILLIAMS

**Direct Appeal from the Circuit Court for Giles County
Nos. 8650, 8651, 8652      Jim T. Hamilton, Judge**

**No. M1999-00780-CCA-R3-CD - Filed July 3, 2001**

In 1998, the Giles County Grand Jury indicted the Defendant for one count of statutory rape and ten counts of sexual battery. In 1999, a Giles County jury tried the Defendant and found him guilty of one count of statutory rape and five counts of sexual battery. Following a hearing, the trial court sentenced the Defendant to two years incarceration for each conviction and ordered that five of the six sentences be served consecutively, resulting in an effective sentence of ten years. The Defendant now appeals as of right, arguing (1) that the evidence presented at trial was insufficient to support his convictions for sexual battery; (2) that the trial court erred by consolidating all counts for trial; and (3) that he was improperly sentenced. We conclude that the evidence is insufficient as to one count of sexual battery and thus reverse one of the Defendant's convictions for sexual battery. In addition, we conclude that the trial court erred by consolidating all counts for trial, but conclude that this error was harmless. Finally, following our reversal of the sexual battery conviction in case 8652, count one, with a two-year sentence, and a de novo review of the remaining sentences imposed by the trial court, we conclude that an effective sentence of eight years in the Tennessee Department of Corrections is appropriate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part and Affirmed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Claudia Jack, Beverly J. White and Shipp Weems, Pulaski, Tennessee, for the appellant, Nicholas Williams.

Paul G. Summers, Attorney General and Reporter; Todd R. Kelley, Assistant Attorney General; Elizabeth T. Ryan, Assistant Attorney General; T. Michael Bottoms, District Attorney General; Patrick S. Butler, Assistant District Attorney General; and Richard H. Dunavant, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In July 1998, the Giles County Grand Jury indicted the Defendant, Nicholas Williams, for one count of statutory rape and ten counts of sexual battery. In June 1999, the trial court granted the State's motion to consolidate all offenses for trial. Prior to trial, the State dismissed five counts of sexual battery. In June 1999, the Defendant was tried by jury and found guilty of one count of statutory rape and five counts of sexual battery. The trial court sentenced the Defendant as a Range I standard offender to two years incarceration for statutory rape and to two years incarceration for each count of sexual battery. The trial court ordered that five of the counts be served consecutively for an effective sentence of ten years.

The Defendant now appeals his convictions and sentence, arguing (1) that the trial court erred by consolidating all counts for trial; (2) that the evidence was insufficient to support his convictions for sexual battery; and (3) that he was improperly sentenced. We reverse one of the Defendant's convictions for sexual battery because we agree that the evidence was insufficient to support this conviction. We also conclude that the trial court erred by consolidating all counts for trial, but find such error harmless.

The charges in this case stem from a series of incidents involving three friends of the Defendant's daughter. The friends, all victims in this trial, were M.B., G.M., and A.Y.[1] At trial, the Defendant's daughter, Amanda Williams, testified that in 1997, she began her senior year of high school and moved to Lynnville, Tennessee with her father, the Defendant, who was thirty-eight years old at the time. Williams testified that she became friends with a number of girls at her high school and asked many of her friends to visit the two-bedroom trailer where she lived with her father. Williams maintained that her father pressured her to bring friends to their home, and she testified that if she did not "[f]ind someone to come over," she "would get in trouble." Williams stated that when she brought friends home, the Defendant provided alcohol and marijuana for them at the trailer. She recalled that she and her friends would drink alcohol, smoke marijuana, and play cards with the Defendant. She also testified that the Defendant sometimes took her and her friends to Columbia for a movie or dinner, and she recalled that on these occasions, the Defendant always "paid everyone's way."

According to Williams, the first friend to visit their home was M.B., who was seventeen years old at the time. Williams stated that she introduced M.B. to the Defendant, and they became friends. Williams testified that the Defendant eventually told her that he and M.B. were "kind of like dating." According to Williams, the Defendant revealed to her that he and M.B. "had sex, but when she told him to stop, he did. And it would have gone further, but [M.B.] didn't want it to, and they quit." Williams stated that the Defendant put M.B.'s senior photograph on their living room wall "'[c]ause they liked each other."

Several months later, A.Y., a fifteen-year-old high school freshman, began to visit the Williams' trailer. Williams testified that she, A.Y., and the Defendant "would party and go places together." She stated that on weekends, they would usually "go out, but . . . sometimes [they] would

_____

[1] Due to the ages of the victims and the nature of the crimes, we will refer to the victims by initial only.

stay home, get drunk and smoke weed" provided by the Defendant. Williams recalled that one night when A.Y. visited her home, the Defendant pressured Williams to "get [A.Y.] to keep drinking, 'til she'd pass out." Williams stated that she complied with her father's request, and A.Y. continued to consume alcohol. Eventually, A.Y. fell asleep in Williams' bedroom. Williams testified that she slept on the couch that night because the Defendant told Williams not to enter her room until he came out. Williams stated that her father entered the bedroom with A.Y., stayed for a few minutes, and then left. The Defendant later told Williams that "when [A.Y.] was asleep, he tried to mess with her, and she would . . . roll over and tell him, no, and he would quit." Williams testified that she spoke with A.Y. on the telephone after that night. After their conversation, in response to a question A.Y. had asked her on the phone, she asked her father "if [A.Y.] would come over again, would he promise not to bother her like last time and to have her just be a friend."

Williams recalled that on another occasion, the Defendant transported her, her former boyfriend, and A.Y. to Columbia for the evening. She stated that while she and the Defendant were driving to pick up A.Y., the Defendant told Williams to stay in the front seat of the car so that he could ride in the back seat with A.Y. In addition, Williams testified that her father gave A.Y. a birthstone ring that he had purchased for her at Wal-Mart.

On cross-examination, Williams testified that police officers had told her that if she did not "tell [the police] everything [she] knew," she would be charged with contributing to the delinquency of a minor, and she stated that this frightened her. She also admitted that her friends, especially A.Y., often wanted to come to her home. In addition, she testified that she and her friends smoked marijuana and consumed alcohol at parties outside of her home. She stated that her friends sometimes had marijuana of their own, but she explained that her father always provided the alcohol and marijuana at their home. Finally, Williams testified that when she smoked marijuana, her memory sometimes became foggy, but she insisted that she remembered all of the events that she had testified about on direct examination.

M.B. testified that during her senior year of high school, she became friends with Amanda Williams, and she started occasionally spending the night at the Williams' trailer in Lynnville. She recalled that one Sunday after she spent the night there, she and Williams went to church. When they arrived back at the trailer after church, Williams decided to visit her boyfriend and asked M.B. to stay at the trailer. After Williams left, M.B. and the Defendant sat on the couch and began to talk. While they talked, the Defendant put his arm around M.B. M.B. recalled that "at first, [she] was willing." She testified,

> You know, he kissed me and I kissed him back. And then it started going onto more stuff. And he tried to touch my breast . . . . And he undone his pants and pulled out his penis. . . . [H]e tried to get me to touch it, . . . and I was like, no . . . . just leave me alone.

M.B. testified that the Defendant then pulled back her dress, pushed aside her panties, and penetrated her vaginally with his penis. M.B. continued to protest, however, and the Defendant "finally just stopped." M.B. then called Williams and asked her to return home.

M.B. testified that some time after this incident, she returned to the Williams' trailer with two of her friends to pick up Amanda Williams. She stated that the Defendant was present when they arrived, and she "told him to leave [her] alone." M.B. testified, "[The Defendant] started calling me and [Amanda Williams] slut, . . . and he wouldn't let [Amanda Williams] go out with me, just 'cause I wouldn't stay there with him. . . . And he wouldn't even let me and Mandy talk [n]o more, just 'cause I wouldn't stay there no more."

M.B. further testified that she gave Williams a copy of her senior photograph. She stated that the Defendant put the photograph in a picture frame on the living room wall and later placed it in his Bible. She also recalled that when she visited the Williams' trailer, she sometimes consumed alcohol and smoked marijuana that the Defendant provided for her and for his daughter.

G.M., who was fifteen years old at the time of the crimes, testified that she was friends with Amanda Williams and A.Y. She stated that she visited the Williams' trailer several times, where she drank alcohol and smoked marijuana bought by the Defendant. She recalled that one night while she was at the trailer, she, Williams, and A.Y. went to sleep in Williams' bed. She stated that while they slept, the Defendant entered Williams' bedroom and "mess[ed] with" A.Y. She recalled that she and A.Y. discussed the incident the following morning.

G.M. testified that on another occasion when she visited the trailer, she played cards with Amanda Williams and the Defendant while they all drank and smoked marijuana. Afterwards, G.M. went into Williams' bedroom to sleep while Williams slept on the couch in the living room. According to G.M., about fifteen to twenty minutes after she got into the bed, the Defendant entered the bedroom. G.M., who was lying on her stomach at the time, felt him put his hands "underneath the elastic of [her] shorts" and try to pull them down. She testified that the Defendant's hand was on her buttocks. G.M. testified that when this happened, she moved "to make him think [she] was waking up," and he left the room. However, a few minutes later, he returned and tried again. G.M. stated that this happened about five times until she finally rolled herself up in the blanket. G.M. testified that she never returned to the Williams' trailer after the incident.

A.Y. also testified at trial. She stated that she was a freshman in high school at the time of the crimes in this case. She recalled that she and Amanda Williams were "best friends" at that time and that she visited the Williams' trailer two or three times a week after she and Williams became friends. A.Y. testified that she kept a journal in which she recorded several incidents that occurred at the Williams' home. She stated that on March 26, 1998, she went to the trailer after school and spent the night there with the Defendant, Williams, and G.M. She recalled that during the evening, they all played cards, smoked marijuana, and drank alcohol. Afterwards, she, Williams, and G.M. fell asleep in Williams' bed. A.Y. stated that she was awakened by the Defendant, who was caressing her legs. When she realized what was happening, she kicked him and then fell back asleep. The Defendant, according to A.Y., left the room, but came back in numerous times to rub her legs. Each time, she kicked him, and eventually, he stopped. A.Y. stated that while the Defendant was in the room, she tried to awaken Williams and G.M. by hitting them, but neither of them woke up. A.Y. testified that the next morning she told G.M. what had happened and then went home.

-4-

On March 28, 1998, A.Y. returned to the Williams' home. A.Y. testified that on that night, as they did on each occasion she visited the Williams' home, she, Williams, and the Defendant got "drunk and high" by drinking alcohol and smoking marijuana bought by the Defendant. At the end of the night, she and Williams fell asleep in Williams' bed. Again, the Defendant entered the bedroom and began caressing A.Y.'s legs, and A.Y. kicked him. A.Y. stated that when he rubbed her legs, the Defendant rubbed her legs "above [her] knee[s]." Several times, the Defendant attempted to caress A.Y.'s legs while she slept, and several times, she kicked him. A.Y. testified that every time the Defendant believed she had fallen back asleep, he would begin to touch her. A.Y. stated that she tried "to curl up in the covers, to try to get away from him, . . . just hoping he wouldn't come in there."

A.Y. testified that another incident occurred on the night of April 3, 1998. A.Y. stated that during the evening, she, Williams, and the Defendant drank several shots of tequila and smoked marijuana. The Defendant encouraged her to keep drinking when she wanted to stop. She recalled that after she and Williams "passed out," A.Y. awakened to find the Defendant's hand inside of her shorts underneath her panties. When she woke up, she kicked the Defendant, and the Defendant apparently left the room. On April 9, 1998, a similar incident occurred. A.Y. stated that after she, Williams, and the Defendant "'got drunk and high" and she "passed out," the Defendant woke her up by trying to "jerk [her shorts] off of [her]." A.Y. recalled that when this happened, the Defendant was holding the back of her shorts while trying to pull them down. She stated that his fingers were inside of her panties and that the Defendant managed to pull her shorts and panties below her buttocks.

When asked why she continued to return to the Williams' home despite these incidents, A.Y. responded that she did so because Amanda Williams "would beg [her] to go over there." She also testified that Williams and the Defendant "would show up at [her] softball practices," and she left with them because she was afraid to tell her mother what had occurred at the Williams' trailer. A.Y. recalled that once when the Defendant and Williams arrived at her softball practice, Williams retrieved a birthstone ring from the glove compartment of their car and handed it to A.Y. A.Y. stated that she understood the ring to be a gift from the Defendant.

A.Y. said she once told Amanda Williams that she would not come over because she "didn't want [the Defendant] touching" her. A.Y. heard Williams relay this message to the Defendant. Later that day, Williams, the Defendant, and Williams' former boyfriend drove to A.Y.'s house to take her out that evening. A.Y. recalled that when they arrived, Williams and her former boyfriend were sitting in the front seat of the car, and the Defendant was sitting in the back seat. However, A.Y. told Williams that she did not feel comfortable sitting in the back seat with the Defendant, and they changed seating positions.

A.Y. testified that one day at school she noticed that Amanda Williams' eye was injured. Although Williams claimed that a screen door had hit her, A.Y. began to suspect that the Defendant was abusing Williams. A.Y. therefore considered reporting the Defendant's actions to the police.

She wrote a letter to G.M. detailing what the Defendant had done to her, but before she could deliver it to G.M., A.Y.'s mother discovered the letter. A police investigation ensued.

Deputy Joey Dickey of the Giles County Sheriff's Department testified that he investigated the allegations against the Defendant in this case. He stated that he initially interviewed G.M. and A.Y. separately, and based on their interviews, he decided to conduct an additional interview of M.B. Chief Investigator Michael Chapman of the Giles County Sheriff's Department testified that he arranged for Amanda Williams to be interviewed by a female employee of the Department of Children's Services because he was concerned that Williams may have been victimized by her father. He stated that after he received the results of all interviews, he obtained a warrant and arrested the Defendant.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant contests the sufficiency of the evidence used to convict him. The jury found the Defendant guilty of one count of statutory rape against victim M.B., one count of sexual battery against victim G.M., and four counts of sexual battery against victim A.Y. The Defendant argues that the evidence was insufficient to convict him of all five counts of sexual battery. With regard to his convictions for sexual battery against victim A.Y, he argues that there was no "sexual contact," as defined by our statute, with any of the victim's "intimate parts." See Tenn. Code Ann. § 39-13-501(2), (6). He further contends that no evidence was presented that each alleged sexual battery was accomplished by means of force or coercion.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds, State v. Hooper, 29 S.W.3d 1 (Tenn. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal

defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sexual battery is defined, in pertinent part, as "unlawful sexual contact with a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act . . . ." Tenn. Code Ann. § 39-13-505(a)(1).[2]

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's , the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . .

Id. § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being . . . ." Id. § 39-13-501(2). "Coercion" is defined as "the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Id. § 39-13-505(b). Finally, "'[f]orce' means compulsion by the use of physical power or violence and shall be broadly construed . . . ." Id. § 39-11-106(12).

The Defendant first contends that the evidence was insufficient to support his convictions for sexual battery against A.Y. because no evidence was presented that "unlawful sexual contact" occurred. To properly resolve this question, we must carefully consider A.Y.'s testimony at trial: A.Y. first testified that on March 26 while she slept, she "felt someone rubbing on her legs," and she "kicked them off." She stated that this occurred several times. When asked how the Defendant rubbed her legs, she stated, "He would get his hands, and . . . start rubbing them up my legs. And when he would get up to about right here, I would kick him off of me." There is no clarification in the record of what A.Y. meant by "right here." On cross-examination, defense counsel asked A.Y. if the Defendant rubbed her legs "right up to about the knee," and A.Y. responded, "Yes, ma'am."

A.Y then testified that on March 28, the Defendant again rubbed her legs while she slept, and she again kicked him. She stated that he touched her "[r]ight above her knee" and indicated to the jury where the Defendant touched her.

A.Y. next recalled that on April 3, she "woke up, and [the Defendant's] hand was in [her] shorts, trying to get underneath [her] pants." She stated that his hands were "underneath [her] shorts, under [her] panties" and showed the jury where the Defendant touched her. She testified that she again "kicked him off."

Finally, A.Y. testified that on April 9, the Defendant "tried to jerk [her shorts] off" by grabbing the back of her shorts and "jerk[ing]" them down. On this occasion, the Defendant's hands

---

[2] Although there are several means by which an individual can accomplish sexual battery, see id. § 39-13-505(a)(1)-(4), the Defendant was indicted for each count of sexual battery as follows: The Defendant "did unlawfully, intentionally, knowingly or recklessly, and forcibly or coercively engage in sexual contact with" the victim. Thus, the only means of sexual battery that we may consider is sexual battery accomplished by force or coercion.

were "underneath [her] panties and [her] shorts." Again, A.Y. indicated to the jury where the Defendant had touched her. On cross-examination, A.Y. recalled that the Defendant managed to pull her shorts and panties down below her buttocks.

Because the definition of "intimate parts" includes the "the primary genital area, groin, inner thigh, [and] buttock," of a human being, id. § 39-13-501(2), we conclude that sufficient evidence was presented from which a jury could have determined that the Defendant had "unlawful sexual contact" with A.Y. on March 28, April 3, and April 9. However, we must conclude that insufficient evidence was presented to support the jury's verdict that the Defendant had "unlawful sexual contact" with A.Y. on March 26. A.Y. testified that on March 26, the Defendant rubbed her legs to about the knee, and although she indicated to the jury where the Defendant touched her, the State unfortunately failed to clarify on the record precisely where A.Y. was touched. No evidence is included in the record indicating that the Defendant touched any part of A.Y.'s thigh, or any of her other "intimate parts," on March 26. Accordingly, we must reverse the Defendant's conviction for the sexual battery of A.Y. that occurred on March 26, 1998.

The Defendant next argues that the evidence was insufficient to show that each count of sexual battery was accomplished by means of coercion or force. As previously stated, "coercion" is defined as "the threat of kidnapping, extortion, force or violence to be performed immediately or in the future," id. § 39-13-505(b), and "'[f]orce' means compulsion by the use of physical power or violence and shall be broadly construed . . . ." Id. § 39-11-106(12).

Having reviewed the record, we conclude that sufficient evidence was presented that force was used to accomplish all remaining counts of sexual battery as to A.Y. and the count of sexual battery as to G.M. A.Y. testified that on each occasion that the Defendant tried to touch her, she kicked him. She recalled that each time she kicked him, he left the room, but soon returned to try to touch her again. In addition, she testified that on one occasion, the Defendant tried to "jerk" her shorts off of her. In light of the foregoing, a rational trier of fact could reasonably have found that the Defendant used force to commit each count of sexual battery against A.Y.

Likewise, G.M. testified that she was lying on her stomach in bed when the Defendant entered the room several times and tried repeatedly to pull her panties down. The Defendant persisted in this behavior until G.M. eventually rolled herself into a blanket. Although G.M. made an effort to protect herself by wrapping herself in the blanket, she testified, "I didn't know if I should say anything or not, because I didn't know what he would do." We conclude that a broad construction of "force" could allow the jury to rationally conclude that the element of "force" was proven beyond a reasonable doubt with regard to the Defendant's conduct toward G.M. We thus reverse one conviction for sexual battery on the basis of insufficient evidence and affirm all remaining convictions.

## II. CONSOLIDATION

The Defendant argues that the trial court erred by consolidating the offenses in this case for trial. Rule 14 of the Tennessee Rules of Criminal Procedure provides as follows: "If two or more offenses have been joined or consolidated for trial . . . , the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). A trial court's denial of a motion for severance under this rule will be reversed only when there has been an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that is part of the same transaction. State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999). "Before multiple offenses may be said to reveal a distinctive design, . . . the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" Id. (citing State v. Carter, 714 S.W.2d 241, 245 (Tenn.1986)).

> However, the Tennessee Supreme Court has noted that
> the mere existence of a common scheme or plan is not a proper justification for admitting evidence of other crimes. Rather, admission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue. Unless expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.

Id. at 239 n.5. The court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Id. at 240 n.7. Thus, Tennessee Rule of Evidence 404(b) is also relevant to our analysis of this issue. See State v. McCary, 922 S.W.2d 511, 513-14 (Tenn. 1996).

The crimes in this case can be construed as being part of a common scheme or plan in that the evidence shows a distinctive design. The Defendant committed all of the offenses against friends of his daughter who were visiting the Defendant's home. The Defendant provided each victim with alcohol and marijuana. Furthermore, in each instance except that involving M.B., the Defendant touched the victim or tried to remove her shorts while she was "passed out" on his daughter's bed.

However, we cannot conclude that evidence of each of the crimes in this case "would be admissible upon the trial of the others," Tenn. R. Crim. P. 14(b)(1), to establish some other relevant issue. Although offenses that are part of a common scheme or plan are typically offered to establish the identity of the perpetrator, Moore, 6 S.W.3d at 239; McCary, 922 S.W.2d at 514, identity is not a material issue in this case. Nor do we find that the evidence is admissible to establish some other relevant issue. We therefore conclude that the trial court erred by consolidating the cases for trial.

Nevertheless, we conclude that this error was harmless. Rule 52(a) of the Tennessee Rules of Criminal Procedure provides that "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." We cannot conclude that consolidation of all charges in this case affirmatively affected the result of the trial. With the exception of evidence presented concerning one count of sexual battery against A.Y. which we have reversed on the basis of insufficient evidence, the State presented ample, strong evidence to support each separate conviction in this case. Not only did each of the victims in this case testify unequivocally that the Defendant committed the crimes of which he was convicted, but the Defendant's daughter verified much of the girls' testimony. In addition, G.M. verified A.Y.'s testimony as to at least one count of sexual battery. We believe that if this evidence had been presented at separate trials, the trials would have yielded the same convictions. We therefore conclude that the trial court's error in consolidating the separate counts for trial was harmless.

### III. SENTENCING

Finally, the Defendant contends that he was improperly sentenced. The trial court sentenced the Defendant to two years incarceration for each count of sexual battery and to two years incarceration for statutory rape. The trial court ordered that the Defendant's sentence for two counts of sexual battery be served concurrently, but consecutive to all other sentences. The court ordered that all other sentences be served consecutively. The Defendant contests the length of his sentences. He also argues that the trial court erred by ordering consecutive sentences and by denying alternative sentencing.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

Sexual battery and statutory rape are both Class E felonies. Tenn. Code Ann. § 39-13-505(c), -506(c). The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In this case, the trial court failed to make an affirmative showing on the record that it considered all relevant facts, circumstances, and sentencing principles in sentencing the Defendant. Our review of the Defendant's sentence is thus de novo without a presumption of correctness.

## A. LENGTH OF SENTENCES

The Defendant first contests the length of his sentences. The sentencing range for a Range I standard offender convicted of a Class E felony is between one and two years. Tenn. Code Ann. § 40-35-112(a)(5). In sentencing the Defendant, the trial court applied enhancement factor (4), that "[a] victim of the offense was particularly vulnerable because of age," and enhancement factor (15), that "[t]he defendant abused a position of public or private trust . . . ." Id. § 40-35-114(4), (15). The trial judge explained, "[T]hese children came home to someone's home where . . . one of the parents is there, and . . . we all know what type of trust children should, at least, put in a parent." In addition, the trial court stated,

> [The Defendant] was not charged or convicted of what I guess would have been contributing to the delinquency of a minor, in that the proof showed he provided alcohol and/or marijuana to these young girls at his home. And I think the Court will

have to consider that as an enhancing factor, even though he wasn't convicted or charged with those offenses . . . .

The trial court should not have considered "proof . . . [that the Defendant] provided alcohol and/or marijuana to [the victims] at his home." As the trial court pointed out, the Defendant was not charged or convicted of any crime based on these allegations, and we note that there is no catch-all provision for enhancement factors in our statute. See Tenn. Code Ann. § 40-35-114.

The trial court, however, correctly applied enhancement factor (4) in sentencing the Defendant for each remaining count of sexual battery. Tennessee Code Annotated § 40-35-114(4) provides for enhancement of a defendant's sentence when the victim of the offense is "particularly vulnerable because of age or physical or mental disability . . . ." A victim is particularly vulnerable if, due to her physical or mental limitations, she is incapable of resisting, summoning help, or testifying against the perpetrator. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993); State v. Clayton Eugene Turner, No. 03C01-9805-CR-000176, 1999 WL 817690, at *18 (Tenn. Crim. App. 1999). Furthermore, a victim's physical or mental limitation may be temporary or self-induced. Clayton Eugene Turner, 1999 WL 817690, at *18. The State must prove that a victim's limitations render her particularly vulnerable, and this is a factual issue to be determined by the trier of fact on a case-by-case basis. State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997).

The Defendant committed three of the remaining counts of sexual battery against victim A.Y. while she was asleep and intoxicated. He committed one count of sexual battery against G.M. while she was intoxicated. We conclude that the sleeping, intoxicated minor victims in this case were particularly vulnerable to the Defendant's attack. See id.; Clayton Eugene Turner, 1999 WL 817690, at *18. The record thus justifies application of enhancement factor (4) as to all remaining counts of sexual battery.

We note that enhancement factor (4) does not apply with regard to the statutory rape of M.B., who was neither intoxicated nor asleep at the time of the offense. However, we conclude that enhancement factor (15) was appropriately applied with regard to the statutory rape of M.B., as well as with regard to all remaining counts of sexual battery. See State v. Jernigan, 929 S.W.2d 391, 397 (Tenn. Crim. App. 1996); State v. Hayes, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995). The Defendant was entrusted with the care of the victims while they visited his home and on other occasions. He befriended the victims by buying them gifts, treating them to dinner and movies, and engaging in other activities with them. After gaining their trust and friendship, he used his influence to get them into an intoxicated state so that he could sexually abuse them. We therefore agree with the trial court that the Defendant abused a position of private trust when committing these crimes.

With regard to mitigating factors, the trial court made the following findings:
Mitigating factors in this case, certainly the proof is plain, and the presentence report is plain, that [the Defendant] completed a high school education. He evidently has an excellent employment record with the company he's employed with. He also

has an exemplary military record. He has no prior criminal record, to speak of, other than I believe one conviction of reckless driving.

. . . I note over here in this presentence report, that in . . . Houston County . . . although the case was never prosecuted, he was charged with . . . [a]ttempted spousal rape.

. . . Another charge, here, that he brought up to the probation officer that he was charged with contributing to the delinquency of a minor in December of 1995. I don't know anything about that. But here again, that obviously involved a minor child in some respect.

In our de novo review of the record in this case, we find that mitigating factors were present in this case: The Defendant does have an excellent work history. In addition, we note that he has only one prior conviction for reckless driving in 1996. See Tenn. Code Ann. § 40-35-113(13). However, we give the mitigating factors little weight and conclude that the mitigating factors are outweighed by the enhancement factor in this case. We therefore conclude that the trial court properly sentenced the Defendant to two years on each count.

## B. CONSECUTIVE SENTENCES

The Defendant next contests the imposition of consecutive sentences. With regard to consecutive sentencing, the trial court stated,

The State has also requested consecutive sentencing and [h]as filed some factors for the Court to consider. And of course, the Court has to consider the facts of this case. I've already mentioned the fact that he did provide whiskey and marijuana to these children and then attempted to . . . fondle them or undress them while they slept in his daughter's bedroom.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that

(1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity; the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7).

In this case, factor (5) is applicable and supports imposition of consecutive sentences. See State v. Lane, 3 S.W.3d 456, 459-60 (Tenn. 1999). The Defendant was entrusted with the care of the minor victims when they visited his home and used his influence as the parent of their friend to gain access to the girls. He exploited his relationship with the victims by smoking marijuana and drinking alcohol with the girls, often encouraging them to drink as much as possible apparently so that they would be less likely to protest his subsequent actions. The Defendant then sexually abused the girls, often while they slept and often despite their protests. The Defendant persisted in this reprehensible conduct for a number of months, stopping only at the time of his arrest. In addition, we note that two of the victims submitted victim impact statements describing the emotional damage they suffered as a result of the Defendant's abuse. We therefore conclude that the trial court's imposition of consecutive sentences is amply supported by the record.

## C. ALTERNATIVE SENTENCING

Finally, the Defendant argues that he should have been granted some form of alternative sentencing. Although the trial court obviously denied alternative sentencing in this case, the court failed to state on the record its reasons for doing so. The court also failed to make an affirmative showing on the record that it considered sentencing principles regarding alternative sentencing. As previously stated, we therefore will proceed to review this issue de novo.

Tennessee Code Annotated § 40-35-102(5) provides as follows:
In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .
A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than

-14-

incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of Class E felonies, is presumed to be a favorable candidate for alternative sentencing.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

The Defendant in this case does not have a long history of criminal conduct. Nor have measures less restrictive than confinement been frequently or recently applied unsuccessfully to the Defendant. Furthermore, no evidence was offered that confinement would provide deterrence to others likely to commit similar offenses. See State v. Hooper, 29 S.W.3d 1, 6 (Tenn. 2000) (stating that the record must contain some proof of the need for deterrence before a defendant who is presumed eligible for alternative sentencing may be incarcerated). The remaining question, then, is whether confinement is necessary in this case to avoid depreciating the seriousness of the offense. To deny an alternative sentence solely based upon the nature of the offense, the circumstances of the offense must be "'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (citing State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985)).

We conclude that in this case, confinement is necessary "to avoid depreciating the seriousness of the offense." Tenn. Code Ann. § 40-35-103(1)(B). We must again emphasize the seriousness of the crimes in this case. The Defendant brought minor friends of his young daughter to his home and provided alcohol and marijuana to the girls to gain their trust and friendship and to gain access to the girls. According to the Defendant's daughter, the Defendant asked her to ensure that young girls often visited their home, and on at least one occasion, he also asked his daughter to

ensure that one of her friends became inebriated while visiting them. He then sexually abused the girls while they slept. We conclude that this evidence supports the trial court's denial of alternative sentencing.

Accordingly, we REVERSE the Defendant's conviction for sexual battery in case number 8652, count one and dismiss that charge. We AFFIRM the convictions and sentences for the remaining counts, resulting in an effective sentence of eight years.


_____
ROBERT W. WEDEMEYER, JUDGE